UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RYOHEI AKIMA,

                    Plaintiff,                         Case Number 21-10080

v.                                                 Honorable David M. Lawson

CAITLYN M. PECA,

                    Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION
TO DISMISS AND GRANTING IN PART AND DENYING IN PART THE
DEFENDANT'S FOR SUMMARY JUDGMENT**

Plaintiff Ryohei Akima, a citizen of Japan who was admitted to the United States on a work visa, was driving through Fowlerville, Michigan on February 19, 2020, when he was stopped by police officer Caitlyn Peca and arrested for drunken driving and operating his vehicle without a license. Akima was neither intoxicated nor driving without a proper license, but his arrest had serious immigration, employment, and cultural consequences for him. He sued defendant Peca for violating his constitutional rights. Peca responded with a motion to dismiss, causing Akima to amend his complaint. Another motion to dismiss followed, but before it could be scheduled for a hearing and decided, Peca attempted to appeal the denial of a motion to stay discovery, temporarily transferring jurisdiction to the court of appeals. The appeal was dismissed, but during the delay discovery was completed and Peca filed a motion for summary judgment. Both motions, which are based on the defense of qualified immunity, are now ready for decision. Because the pleaded facts and the discovery record demonstrate that defendant Peca violated Akima's constitutional rights, that those rights were clearly established at the time of the arrest, and that only a plainly incompetent police officer would have arrested Akima under the circumstances presented here, the defendant is not entitled to qualified immunity at this stage of the case. However, the undisputed

facts show that the plaintiff's claim for intentional infliction of emotional distress lacks merit.  The defendant's second motion to dismiss will be denied, and her motion for summary judgment will be granted in part and denied in part.

## I.  Facts and Proceedings

The Court previously dismissed without prejudice the defendant's motion for judgment on the pleadings and allowed the plaintiff to file an amended complaint.  In addition to enhancing the factual basis of her claims, the plaintiff also dropped a previously pleaded claim for malicious prosecution.  The amended complaint alleges the following facts.

Akima is a citizen of Japan who was admitted to the United States on a work visa. Defendant Caitlyn M. Peca is a patrol officer of the Fowlerville, Michigan Police Department.  On February 19, 2020, at around 10:42 p.m., Akima was driving his car south on Grand Avenue in Fowlerville.  He had the following documents in his possession at that time: (1) his Japanese passport, (2) his U.S. work visa, and (3) an International Driver's Permit.  Officer Peca was driving north on Grand Ave and noticed that Akima's vehicle had an inoperative headlight, so she pulled him over.  Peca approached the car, told Akima that he had a dark headlight, and asked him to produce his driver license, vehicle registration, and proof of insurance.  Akima "gave PECA his Japanese passport and USA Visa, however, [he] did not produce the IDP which was located in a backpack in the backseat of his vehicle."  Am. Compl. ¶ 13, ECF No. 22, PageID.285.  Dashcam video of the incident recorded Officer Peca asking Akima if he had a driver license, to which Akima replied that he had an "international driver license."  *Id.* ¶ 14.  However, at no point during the encounter did Peca ask Akima to produce the IDP.  *Ibid.*

Officer Peca told Akima to get out of the car so that she could conduct a field sobriety test. Peca told Akima to (1) "stand with his feet together and hands at his side," (2) "follow her finger

with his eyes only," (3) "stand with his left foot in front of his right foot and hands by his side," (4) "take nine heel-to-toe steps forward, head down, counting out loud, [with his] arms by his side," and (5) "stand on his dominant leg and count one-thousand one, one-thousand two, etc." *Id.* ¶¶ 15-19. Akima alleges that he complied with all of those commands and completed the tasks "correctly" and "as directed." Peca then administered a breathalyzer test, which allegedly registered 0.022 — well below the legal limit of 0.08 for operating a motor vehicle under Michigan state law — but Peca "reported the reading at 0.22 BAC." *Id.* ¶ 21. Based on her erroneous breathalyzer reading, Peca told Akima that he was under arrest for operating while intoxicated (OWI). Akima was compliant and was placed under arrest, after which he was seated in the back seat of Peca's police cruiser.

While Akima was seated in the patrol car, another officer arrived on the scene and spoke to him. The officer asked Akima if he had a driver license, to which Akima responded that he had an "international driver license" in his car, but he "did not have enough time at the beginning of the traffic stop to retrieve it." *Id.* ¶ 24. The other officer also did not ask Akima to produce the IDP at any time. *Ibid.* Peca and the second officer then had a conversation while standing near the cruiser, and while they were talking Akima interjected, told the officers where his IDP was in the car, and asked if he could retrieve it. However, Officer Peca responded that it was "irrelevant" and refused to allow Akima to retrieve the IDP from his vehicle. *Id.* ¶ 26.

Akima was transported to the station for booking, after which a search warrant was obtained for a blood draw. Michigan State Police laboratory results from the blood draw later showed that Akima had a BAC of only 0.014 — also well below the legal limit. *Id.* ¶¶ 28-29. The OWI charge eventually was dismissed several weeks later, after the lab results came back, and the plaintiff never was charged with driving without a license. *Id.* ¶¶ 30-31. However, Akima's U.S.

work visa subsequently was revoked due to the lodging of the OWI charge, and he was deported to Japan.  After his return to Japan, he had to take alcohol abuse classes to reobtain his work visa, and he contends that the incident has "brought great dishonor to Akima and his family."  *Id.* ¶¶ 33-34.  However, he eventually regained his work authorization and returned to the U.S.

The amended complaint pleads claims of (1) false arrest (Count I), (2) false imprisonment (Count III), and (3) intentional infliction of emotions distress (Count III).

The following additional facts were produced during discovery and have been put into the record for the purpose of summary judgment.

Officer Peca testified at her deposition that her first position as a police officer with full arrest powers was with the Fowlerville Police Department, and she had been employed as a police officer for only around six months before the February 2020 traffic stop.  Peca stated that she called Livingston County Sheriff Deputy Adam Jaime to the scene during the traffic stop, because he was a "senior deputy" and she "needed advice."  Peca admitted that during the traffic stop there were "communication issues" with the plaintiff, and she knew at points he "was not understanding what [she] was saying."  Peca admitted that before administering the field sobriety test (FST) routine, she did not ask Akima if he had any medical conditions or disabilities — such as balance problems — that could impact the results.  She also admitted that she made several mistakes according to the proper procedure for an OWI arrest, including failing to inquire about medical conditions, administering the portable breathalyzer test (PBT) before administering the FST, and reading the PBT result incorrectly.  Nevertheless, Peca insisted that she still would have arrested Akima for OWI even if she had read the breathalyzer correctly, based on her observance of his "red bloodshot, watery eyes," "balance issues" during the FST exercises, a "strong odor of intoxicants," and the plaintiff's statement that he "just drank out of the bottle."

Deputy Adam Jaime testified that it was standard procedure to conduct the FST exercise before administering a PBT.  Jaime said that in cases where he conducted an FST that caused him to administer a PBT, he would release the driver if the PBT read less than the legal limit.  Jaime also testified that in order to administer the FST correctly, it is important that there is a "clear line of communication," that the tester gives "clear and understandable commands," and that the driver "understands the clear commands."  Jaime admitted that he was not present at the scene when Officer Peca administered either the FST or PBT tests.  Jaime said that when Peca called him to discuss the situation, she told him that she was "concerned that [the plaintiff] would not understand what she was talking about" if she tried to conduct FST exercises before the PBT.  Jaime testified that he had some "communication issues" while talking to Akima and was not sure that he understood questions that were asked.  He also admitted that other than a "strong odor of intoxicants" he did not observe "any other indicia of intoxication."  Jaime further admitted that he never received training about the use of an international driver license or IDP or whether it allowed a person to drive legally under Michigan law.  Jaime admitted that it would have been proper if a driver says his license is in the vehicle for an officer to ask permission to retrieve it from the car, but he stated to Peca at the time that it was "irrelevant" because Akima was "already under arrest for OWI".

Jaime also testified that he reviewed the portions of the roadside encounter video that were captured by Officer Peca's dashcam before he arrived on the scene.  He admitted that Akima never told him that he had "drank from a bottle," and he could not identify any portion of the video where that statement was made to Officer Peca.  Although Jaime stated that Akima exhibited several "clues" such as performing exercises incorrectly and "raising his hand more than six inches" to maintain balance, he also admitted that Peca did not administer the FST correctly.  Jaime also

observed from the video that Akima had difficulty understanding the commands that Peca was giving him during the FST exercise.

Akima testified at his deposition that he does not have any disabilities, but he stated that he is "not so good at balancing." He admitted that he had drank "beer from a bottle" on the evening of his arrest, but he stated that he was never asked by Peca and did not tell her that he "drank from the bottle." In an affidavit, Akima attested that (1) he at first did not understand what Officer Peca was asking for when she requested his license and registration, (2) he did, however, produce his passport and work visa, (3) he told Officer Peca that he had an "international driver license" or IDP, (4) the IDP was in a backpack in the backseat of his car, (5) he also told Deputy Jaime that he had an IDP, and where it was located in the car, (5) while Jaime and Peca were talking, Akima told them where the IDP was in his car, and he offered to retrieve it, and (6) despite that, he was told by the officers that they "did not need it" and the request to retrieve it was declined.

The plaintiff filed his complaint on January 11, 2021. The Court issued a scheduling order on February 18, 2021, establishing a discovery cutoff on November 26, 2021 and a dispositive motion deadline on December 17, 2021. However, on May 6, 2021, the Court granted the defendant's motion to stay discovery pending a decision on her motion for judgment on the pleadings. The defendant's initial dispositive motion was denied without prejudice on August 26, 2021 after the plaintiff filed an amended complaint. After reviewing the amended complaint and in light of the defendant's first dismissal motion, the Court subsequently denied a second motion to stay the proceedings and directed the parties to proceed with discovery. The defendant, however, filed an interlocutory appeal of the discovery order. The case remained in limbo until April 14, 2022, when the Sixth Circuit dismissed the appeal for want of jurisdiction, after finding

that the discovery order was not a final order subject to appeal. During the interim period, discovery was completed and the defendant filed a motion for summary judgment.

II.

The defendant filed two dispositive motions, both relying on the defense of qualified immunity. We will start with the motion to dismiss.

The standards that govern a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) are well known to the parties: the purpose of the motion is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if the court accepts as true all the facts in the complaint. *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). The complaint is viewed in the light most favorable to the plaintiff, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). To survive the motion, the plaintiffs "must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief." *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The defense of qualified immunity consists of two elements: (1) the facts alleged must make out the violation of a constitutional right; and (2) the right must have been clearly established at the time of the alleged violation. *Cunningham v. Shelby Cnty., Tennessee*, 994 F.3d 761, 764 (6th Cir. 2021) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). The Court may take up the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Adjudication of this affirmative defense at the pleading stage generally is disfavored by the Sixth Circuit. *Hart v. Hillsdale County*, 973 F.3d 627, 635 (6th Cir. 2020) (noting that that court has "repeatedly cautioned [that] 'it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point,' that point is usually summary judgment and not dismissal under Rule 12'") (quoting *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015)). And here, the defendant effectively frustrated her own attempt to obtain a ruling earlier in the case by appealing an order denying a motion to stay discovery before the Court could address the motion to dismiss.

Nonetheless, the defendant seeks and is entitled to a ruling on her challenge to the amended complaint on qualified immunity grounds based on the Rule 12(b)(6) standard. To survive that challenge, "the plaintiff must allege facts that plausibly make out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that [her] conduct violated that right." *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898-99 (6th Cir. 2019) (citations and quotation marks omitted). As the court of appeals has explained, the test is "whether, reading the complaint in the light most favorable to the plaintiff, it is plausible that an official's acts violated the plaintiff's clearly established constitutional right." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (citations omitted).

Akima alleges, among other things, that he was falsely arrested in violation of the Fourth Amendment. Claims of false arrest and false detention are cognizable under the Fourth Amendment (as applied to states through the Fourteenth Amendment, *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985)), which prohibits "unreasonable searches and seizures." U.S. Const. Amend.

IV.  The Fourth Amendment clearly establishes the plaintiff's right to be free from "unreasonable . . . seizures," U.S. Const., amend. IV (although for qualified immunity, the analysis of the right must be more granular, *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("[t]his inquiry . . .  must be undertaken in light of the specific context of the case, not as a broad general proposition")).  "[A] false arrest claim under federal law requires a plaintiff to [plead and] prove that the arresting officer lacked probable cause to arrest the plaintiff."  *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005).  A warrantless arrest can be reasonable, but only "if probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law."  *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988).

In her motion to dismiss, the defendant does not argue that the amended complaint insufficiently pleads a false arrest claim based on the OWI arrest.  Instead, the defendant argues that she is entitled to qualified immunity on this count because the facts alleged in the amended complaint show that the plaintiff did not have a driver license "in his immediate possession" when he was pulled over and arrested, he admits that "did not actually produce" his license to Officer Peca, and the Sixth Circuit held in *Hoover v. Walsh*, 682 F.3d. 481, 499-500 (6th Cir. 2012), that the plaintiff's failure to produce a driver license during a traffic stop gave probable cause to arrest him for a misdemeanor violation of Michigan Compiled Laws § 257.311.  The defendant argues that probable cause to arrest for any offense is sufficient to render the arrest constitutional.

*Hoover* recognized the uncontroversial rule that "Michigan law [] requires a driver to keep his driver's license in his immediate possession at all times while operating a vehicle and to provide it to police officers on request."  682 F.3d. at 499.  However, contrary to the defendant's argument, *Hoover* did not hold that a driver violates this law by not having a driver license literally in his clutches or within arm's reach at every moment while behind the wheel.  Moreover, the case is

readily distinguishable because in *Hoover* the facts showed that the plaintiff did not have a driver license with him at all and only produced a military ID, which was not alleged to be a valid driver credential under Michigan law.  *Id.* at 487 ("After stopping the Dodge Neon, Corporal Walsh approached the vehicle and requested that the driver — Mr. Hoover — produce his license and the car's registration.  Mr. Hoover did not have his license with him and instead gave Corporal Walsh his military identification card.  He did not provide his registration or any other documents.").  The *Hoover* case did not hold, and neither has any other case pointed out to the Court, that an officer is justified in arresting a driver for driving without a license where the person states that he has a valid driver credential, tells the officer where in the vehicle it is located, offers to retrieve it, and the officer responds simply that it is "irrelevant" and proceeds to arrest anyway.

Moreover, as the plaintiff points out, the Michigan cases on point have rejected the proposition that failing to have a license "in hand" upon demand by an officer can supply probable cause to an arrest for driving without a license, where it is undisputed that the license was located within the vehicle. *E.g.*, *People v. Moore*, 12 Mich. App. 519, 522, 163 N.W.2d 237, 238 (1968) ("What constitutes 'immediate possession' in a given case is a question of fact for the jury. Carrying an operator's license in a locked glove compartment is certainly not abnormal in Michigan. Since the license is now an invaluable means of identification, not only for motor vehicle code purposes, but also for cashing checks, etc., it is of little surprise to find licenses within the security of a locked glove compartment. Whether the delay in gaining access to the locked glove compartment constitutes a failure to display a license is a question for the jury to resolve.") (holding that it was error for the state trial court to instruct a jury that a license was not in a driver's "immediate possession" where at the time of a traffic stop it was kept in a locked glove

compartment for which the driver had lost the key, and where the license eventually was produced only after some delay, when the defendant forced open the compartment to retrieve it).

The amended complaint pleads facts that establish an unlawful arrest and overcome the qualified immunity defense at the pleading stage of the case. The motion to dismiss under Rule 12(b)(6) will be denied.

III.

The defendant also moves for summary judgment, again asserting the qualified immunity defense. She also argues that the state law claim must be dismissed because of governmental immunity.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Id.* at 558. (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make

an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

When the qualified immunity defense is raised in a motion for summary judgment, courts must weave the summary judgment standard into each step of the qualified immunity analysis. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The plaintiff is obliged to demonstrate with evidence in the record both that the challenged conduct violated a constitutional right and that the right was clearly established at the time. *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)). "If the plaintiff fails to establish either element, the defendant is immune from suit." *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). But under the summary judgment standard, the Court must view the facts in the light most favorable to the plaintiff, *Saucier v. Katz*, 533 U.S. 194, 201 (2001); "[i]n qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts," *Scott*, 550 U.S. at 378.

"A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Even when there is no case defining a constitutional right that directly mirrors the fact pattern confronted by the defendant, "'an official can be on notice that his conduct violates established law even in novel factual situations.'" *Cahoo*, 912 F.3d at 898 (quoting *Littlejohn v. Myers*, 684 F. App'x 563, 569 (6th Cir. 2017); *Hope v. Pelzer*, 536 U.S. 730, 731 (2002)). The touchstone of the "clearly established" inquiry is "fair warning." *Baynes*, 799 F.3d at 612-13 (quoting *Hope*, 536 U.S. at 741). "Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). And because the defense must be applied to

specific situations, courts "must not 'define clearly established law at a high level of generality.'" *Tlapanco v. Elges*, 969 F.3d 638, 649 (6th Cir. 2020) (quoting *Kisela v. Hughes*, --- U.S. ---, 138 S. Ct. 1148, 1152 (2018)).

This defense insulates state actors from liability in close-call situations. *See Saucier*, 533 U.S. at 206 (explaining that the defense is intended to protect state actors who must operate along the "hazy border" that divides acceptable from unreasonable conduct). The purpose of the defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quotation marks and citation omitted). It has been said that qualified "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Tlapanco*, 969 F.3d at 649 (quoting *Kisela*, 138 S. Ct. at 1152).

The defendant reasserts her argument that Akima's delay in offering to produce his IDP until several minutes into the traffic stop supports a finding of probable cause to arrest him for driving without a license. The defendant also contends that, even though she botched the interpretation of the PBT results, she still had probable cause to arrest the plaintiff because of other features of his behavior at the scene, including that he "jumped out of his car" and "produced a passport instead of a driver license," he admitted to both officers that he had been drinking that night, and based on video evidence showing that he had "issues with balance" during the field sobriety test.

A.  Driving Without a License

The facts summarized earlier are sufficient plausibly to sustain a claim that there was no probable cause for the defendant to arrest the plaintiff on suspicion of driving without a license. Akima has attested that he had an IDP in his possession, that it was in a backpack on the rear seat of the vehicle, and that he could have retrieved it — or directed the defendant to its location — if she had told him to produce it.  The defendant admits that she told the plaintiff that production of the IDP was unnecessary because it was "irrelevant" to the decision to arrest.  But a well-informed officer aware of the relevant law could not reasonably have held such a belief, because the IDP is recognized as a valid driver credential under Michigan Compiled Laws § 257.302a(1).  Moreover, Peca testified that she called Deputy Jaime to the scene because he was a "senior deputy" and she "needed advice" about the situation.  But Jaime admitted that he was unfamiliar with the IDP or whether such a document afforded driving privileges under Michigan state law.  That further bolsters a reasonable inference that the driving force behind the supposed arrest for driving without a license was simply an incorrect and unreasonable belief by both officers that such a credential was not a valid driver license under state law.

Those circumstances taken together are sufficient to sustain a claim that the plaintiff was arrested without probable cause for the misdemeanor offense of driving without a valid license, because the facts known to the officers on the scene would not "warrant a [wo]man of reasonable caution to believe that a crime [was] afoot."  *United States v. Copeland*, 321 F.3d 582, 592 (6th Cir. 2003) (quotations omitted).  Moreover, facts learned by officers on the scene after their initial suspicion is piqued can negate a finding of sufficient probable cause for arrest, where the information subsequently uncovered negates earlier suspicious circumstances.  *Williams v. Maurer*, 9 F.4th 416, 429 (6th Cir. 2021) ("[W]hether Defendants had probable cause to arrest

Williams depends on whether, at the time of the arrest, the facts and circumstances within their knowledge were sufficient to inform a prudent person, or one of reasonable caution, that Williams had committed, was committing, or was about to commit an offense. In other words, even if we were to hold that Defendants reasonably believed that someone within Apartment 103 needed emergency aid, once inside, Defendants still had to have probable cause to believe that Williams committed a crime.  So if the scene within the home demonstrated that Defendants were mistaken about the existence of an emergency, that Williams was the victim of the events giving rise to the emergency, or that the emergency did not give rise to criminal liability, Defendants would lack probable cause to arrest Williams.") (citations and quotation marks omitted).  Even if the defendant initially suspected that the plaintiff was driving without a license based on his failure "immediately" to produce a state driver license, her rejection of his offer to produce a valid international driver credential could support a finding that she imprudently disregarded subsequently uncovered information that negated her initial suspicion.  That was not a close call. Akima had a valid driving credential; driving without a license was not a proper basis for the arrest.

## B.  Drunken Driving

Even though an after-the-fact determination of probable cause for driving without a license could validate the arrest, had the facts supported it, the actual reason Pica arrested Akima was her determination that he was intoxicated while driving a car.  But the plaintiff has produced sufficient evidence to support a claim that there was no probable cause for his arrest on a charge of operating a vehicle while intoxicated.

"In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Parsons v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008) (quotations omitted).  This is, therefore, not a matter typically amenable

to disposition on summary judgment.  The Sixth Circuit has held that post-arrest laboratory results showing a negligible BAC called into question the credibility of an officer's other assertions about on-scene indications of impairment sufficiently to preclude summary judgment on a Fourth Amendment claim of arrest without probable case, and that the reasonableness of an officer's assessment of probable cause based on "ambiguous" roadside sobriety tests presents a question of fact that precludes qualified immunity and requires submission to a jury.  *Miller v. Sanilac County*, 606 F.3d 240, 249 (6th Cir. 2010) ("Although Wagester's claims, if believed, would constitute probable cause to arrest for driving under the influence of alcohol, a jury could reasonably conclude, in light of the 0.00% blood alcohol result and Miller's testimony, that Wagester was being untruthful generally about his observations and did not have probable cause to believe Miller was drinking.  In light of the conflict in the evidence, the jury could conclude that Wagester was lying."); *Green v. Throckmorton*, 681 F.3d 853, 865-66 (6th Cir. 2012) ("We are ultimately convinced that Green's performance on the tests was sufficiently ambiguous to submit the probable-cause question to the jury.  She completed several of the tests without any apparent difficulty and others with only minor mistakes.  And the video does not show whether she could follow the pen with her eyes when Throckmorton tried to administer the HGN test.  Because reasonable jurors could interpret the video evidence differently, we conclude that the district court erred in deciding as a matter of law that Throckmorton had probable cause to arrest Green.").  Those rulings map on to the facts in this case directly.

Moreover, Officer Peca's assertions about the non-BAC indicators of intoxication are called into question by additional facts in the record, including (1) her admissions that she made several errors in the conduct of both the FST exercise and PBT, (2) the absence from the recorded video of any statement by the plaintiff that he "drank from the bottle" as Peca claimed, (3) the

difficulties in communication between Peca and Akima, which Peca admitted and which were confirmed by Deputy Jaime's observations, and (4) Deputy Jaime's observations of mistakes by Peca during the FST and apparent communication difficulties.

The plaintiff alleged and has attested that he was compliant during the roadside encounter and completed all of the field sobriety tests "as directed," to the best of his ability. The post-arrest blood test results put into serious dispute the credibility of the defendant's assessment of probable cause based on the supposed observance of "clues" in the plaintiff's behavior. The roadside interaction between the plaintiff and defendant Peca is captured on the video exhibit DVD1, from around timestamp 08:50 to around 18:00, and the plaintiff's behavior during that span of the video includes no readily apparent signs of significant impairment or incapacity. Taken together, all of the facts discussed above are sufficient plausibly to support a claim of arrest without probable cause according to clearly established law in this circuit.

Nonetheless, when assessing qualified immunity here, there remains the question whether defendant Peca's "mistake" in reading the PBT is within the margin of error allowed by qualified immunity. One might assume that an officer trained in the use of the PBT device and roadside OWI arrest procedures certainly ought to be regarded as "plainly incompetent" and therefore denied the protection of the immunity doctrine where she commits such a consequential error as misreading a portable breathalyzer testing device by a factor of 10. *Tlapanco*, 969 F.3d at 649. However, even leaving that aside that view, the defendant is not entitled to the shield of immunity because (1) the relevant "mistake" is not her mistake in reading the PBT, but in her calculation of probable cause based on the facts, viewed in the light that they would be perceived by an objectively reasonable officer at the scene, (2) the only undisputed *fact* relevant to the OWI arrest is a PBT reading of 0.02, and no objectively reasonable officer would have believed that probable

- 17 -

cause for an OWI arrest was supplied by that reading, and (3) all of the other facts that could have supplied probable cause are in dispute, and qualified immunity cannot be afforded to the defendant on the basis of those disputed facts.

The rules for applying qualified immunity in the false arrest context are well settled. "Ordinarily, an assessment of whether an officer is entitled to qualified immunity after a plaintiff has alleged an illegal arrest requires determining whether there was probable cause for the arrest. Probable cause exists if the 'facts and circumstances within [an officer's] knowledge and of which [she] had reasonably trustworthy information were sufficient to warrant a prudent [wo]man in believing that the [arrestee] had committed or was committing an offense.'" *Richards v. Cnty. of Washtenaw*, 818 F. App'x 487, 491 (6th Cir. 2020) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "'[A]n arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time.'" *Ibid.* (quoting *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008)).

But even in that context, "'the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.'" *Barton v. Martin*, 949 F.3d 938, 950 (6th Cir. 2020) (quoting *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002)). And the "probable cause determination must take account of both the inculpatory and exculpatory evidence then within the knowledge of the arresting officer at the time of the arrest," and "an officer cannot simply turn a blind eye toward potentially exculpatory evidence." *Ibid.* (cleaned up) (quoting *Courtright*, 839 F.3d at 521; *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007). The probable cause examination by the Court requires an objective review of the undisputed facts and consideration of how they would be perceived by an objectively reasonable officer at the scene.

"An objective, not a subjective, standard applies." *Barrera v. City of Mount Pleasant*, 12 F.4th 617, 620 (6th Cir. 2021) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)); *see also Fineout v. Kostanko*, 780 F. App'x 317, 327 (6th Cir. 2019) ("Reasonableness is an objective inquiry — we look to whether an action 'is objectively justified, rather than to the motive of the . . . officer.'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011)).  Therefore, although the Court "must look at the circumstances through the eyes of a reasonable officer," the Court need not "'accept the officers' subjective view of the facts when making this assessment.' Rather, 'the action must be viewed in light of the surrounding circumstances.'" *Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2022) (quoting *Jacobs v. Alam*, 915 F.3d 1028, 1041 (6th Cir. 2019); *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005)).  Nevertheless, "[u]nder this standard, a search or seizure may be permissible even though the justification for the action includes a *reasonable* factual mistake." *Heien v. North Carolina*, 574 U.S. 54, 57 (2014) (emphasis added).

As discussed above, the only undisputed fact relevant to the OWI arrest in this case was the PBT reading of 0.02.  Notably, the defendant does not argue, and never has claimed, that she had probable cause to arrest the plaintiff based on her erroneous perception that the PBT registered 0.22 instead of the actual reading of 0.02.  Moreover, she candidly admits that she was mistaken when she read the result.  No reasonable officer, and certainly no officer who was plainly competent in roadside OWI arrest procedures, would have believed that a PBT reading of 0.02 constituted probable cause for a drunk driving arrest.  The mistake in reading the PBT device was not a reasonable factual error for an officer to make under the circumstances; it falls instead into the domain of plain incompetence which is not shielded by qualified immunity.  *See Harris v. City of Saginaw*, No. 20-13075, 2022 WL 1609431, at *12 (E.D. Mich. May 20, 2022) ("Resolving all reasonable inferences in Plaintiff's favor, the only way that the Officer Defendants could receive

qualified immunity at this juncture would be if a *reasonable* officer could have believed that she could arrest a person based on an *unreasonable* mistake of fact. In addition to being inherently illogical, such a holding would be contrary to clearly established law.").

The defendant does argue that other facts perceived by her at the scene sufficed to establish probable cause. She points to the plaintiff's (1) watery, bloodshot eyes, (2) his failures on the horizontal gaze test, (3) his teetering gait and noncompliance in the walk-and-turn test, (4) a "strong odor of alcohol," and (5) his statement that he "drank from the bottle." The problem for the defendant relying on those features to support probable cause is that all of those circumstances are in dispute. The plaintiff denies that he ever stated that he "drank from the bottle." The defendants have not identified any portion of the video evidencing such a statement. The visible condition of his eyes is not perceptible from the dash cam footage. Similarly, his ability to track movements with his gaze are not clearly perceptible from the video. Even if there are some "balance issues" evidenced in the video, the significance of any such issues is debatable based on Deputy Jaime's admission that the walk-and-turn test was not properly administered by Officer Peca, and Peca's own admission that she was concerned that the plaintiff could not clearly understand her instructions due to a language barrier. Those ambiguous indications, the magnitude and significance of which are not conclusively resolved by review of the dash cam video, leave the crucial facts underlying the probable cause determination in material dispute. *See Green*, 681 F.3d at 865-66. Moreover, the credibility of Officer Peca's testimony about her observation of indications of intoxication also is called into question by the undisputed evidence that both the PBT and a later blood test revealed a blood alcohol content well below the legal limit of intoxication. *Miller*, 606 F.3d at 249.

As to the putative arrest for driving without a license, no reasonable officer on the scene plausibly could have believed, at the conclusion of the roadside encounter, and there was probable cause to arrest for that offense, where the plaintiff told the officers at the scene that in fact he had a valid driver credential in his backpack on the rear seat of the car.   When assessing probable cause, Peca was required to account for that exculpatory evidence presented to her at the scene. *Barton*, 949 F.3d at 950; *Courtright*, 839 F.3d at 521; *Logsdon*, 492 F.3d at 341.  Turning a blind eye is exactly what Officer Peca did when she told the plaintiff that his possession of a IDP was "irrelevant" to her determination to arrest him.

At this stage of the case, fact questions preclude summary judgment in favor of the defendant on the defense of qualified immunity for the plaintiff's false arrest claim.

The plaintiff's claim for false imprisonment under the Fourth Amendment arises from the same underlying facts.  The Sixth Circuit generally merges the analysis of claims of "false arrest" and "false imprisonment" and regards such claims as rising or falling in unison based on the evaluation of probable cause for the arrest.  *Saltmarshall v. Prime Healthcare Servs.-Garden City LLC*, 831 F. App'x 764, 768, 2020 WL 6042431 (6th Cir. 2020) ("Saltmarshall asserts claims against Smith for false arrest and against Smith and Munson for false imprisonment. Under both Michigan and federal law, however, false arrest is a subspecies of false imprisonment; an unlawful arrest is just one way to imprison someone. As such, we will treat them here as one and will refer to them as a claim for false imprisonment. The sustainability of Saltmarshall's claim hinges on whether Smith had probable cause to arrest him.") (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010); *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 672 N.W.2d 351 (2003); *Odom v. Wayne County*, 482 Mich. 459, 760 N.W.2d 217 (2008)).  For the same reasons discussed above, the facts presented by the plaintiff

are sufficient to state a federal claim of false imprisonment premised on his clearly established right to be free from an arrest without probable cause for either suspected offense.

### C.  State Law Claim

The plaintiff also asserts a claim that the defendant intentionally inflicted emotional distress upon him when she arrested him without probable cause.  He believes that an inference of "malice" may be drawn from Peca's "admission" at her deposition that she "lied in her report" where she wrote that the plaintiff was "compliant during his arrest."

To prove a claim for intentional infliction of emotional distress under Michigan law, a plaintiff must demonstrate that (1) the defendant's conduct was extreme and outrageous, (2) the plaintiff suffered severe emotional distress, (3) there is a causal nexus between the defendant's conduct and the plaintiff's emotional distress, and (4) the defendant intended to or was reckless in causing severe emotional distress.  *Lucas v. Awaad*, 299 Mich. App. 345, 359, 830 N.W.2d 141, 149 (2013).  However, as the defendant correctly argues, a police officer executing an arrest supported by probable cause does not act in an extreme or outrageous manner.  *Walsh v. Taylor*, 263 Mich. App. 618, 634, 689 N.W.2d 506, 517 (2004) (holding that because the officer established probable cause to arrest the plaintiff, "as a matter of law he cannot be liable for intentional infliction of emotional distress.").  Absent some additional proof of outrageous conduct, the plaintiff ordinarily cannot prevail on an IIED claim merely by showing that the officer intentionally executed a valid arrest.  *Lewis v. LeGrow*, 258 Mich. App. 175, 197, 670 N.W.2d 675, 689 (2003) (holding that the plaintiff must show that a defendant specifically intended to cause him severe emotional harm).

As discussed above, the facts made out in the record sufficiently suggest that the arrest was not lawful, because it was not supported by probable cause.  However, federal courts generally

hold that a claim for IIED is made out only where the defendant procured an arrest and ensuing charges knowingly based on false or fabricated evidence.  *Bickerstaff v. Cuyahoga County*, No. 18-01142, 2019 WL 7500494, at *23 (N.D. Ohio Aug. 12, 2019), *report and recommendation adopted*, 2019 WL 5303967 (N.D. Ohio Oct. 21, 2019) ("Accepting the facts in Bickerstaff's complaint as true, Bickerstaff has raised a plausible emotional-distress claim against the Officer defendants. Although the Officer defendants acted within their roles as police officers when they arrested her and when McCandless filed a police report against her, Bickerstaff has alleged that they conspired to initiate the arrest and charge her with malice and in bad faith. Here, Bickerstaff alleges that the Officer defendants acted maliciously when they met with unnamed prosecutors to plan an arrest and bring charges against her. Further, she alleges that they acted in bad faith when they brought charges against her despite knowing that she did not own the gun found in her back seat, and when Officer McCandless filed a false police report against her. These alleged acts fall within exceptions to statutory immunity for officers.") (applying Ohio law) (citations omitted). Here, the plaintiff evidently has abandoned any claim that Officer Peca knowingly falsified any evidence against him.  Her acts, therefore, fall short of the bar for "extreme and outrageous" misconduct.

The defendant is entitled to summary judgment on that claim.

### IV.  Conclusion

The amended complaint adequately makes out facts sufficient to defeat the Rule 12(b)(6) challenge premised on lack of facts to show that there was no probable cause for an arrest for driving without a license.  The facts produced during discovery also are sufficient to demonstrate that fact questions remain about whether the arrest for OWI violated the plaintiff's clearly

established constitutional rights.   Summary dismissal based on qualified immunity is not appropriate.  However, the defendant is entitled to dismissal of the state law claims.

Accordingly, it is **ORDERED** that the defendant's motion to dismiss (ECF No. 26) is **DENIED**.

It is further **ORDERED** that the defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.**   The claim for intentional infliction of emotional distress is **DISMISSED WITH PREJUDICE**. The motion for summary judgment is **DENIED** in all other respects.

It is further **ORDERED** that the parties shall appear for a final pretrial conference on **November 29, 2022 at 10:30 a.m.**, and for trial on **December 13, 2922 at 8:30 p.m**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  November 7, 2022